Filed 9/30/22  Sandpebble Apartments v. Nevada Capital Ins. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SANDPEBBLE APARTMENTS, LLC,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>NEVADA CAPITAL INSURANCE COMPANY,<br><br>Defendant and Respondent. | B315903<br><br>(Los Angeles County Super. Ct. No.19STCV29373) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Law Offices of Wallace C. Doolittle, Wallace C. Doolittle, and James P. Downs for Plaintiff and Appellant.

Gladstone Weisberg, Gene A. Weisberg and Ronald Anthony DiPietra for Defendant and Respondent.

Non-party Sand Pebble Village Apartment Homes, LLC (Sandpebble 1) owned real property and insured that property under an insurance policy issued by respondent Nevada Capital Insurance Company (Nevada Capital). After the property sustained damage in a fire, Sandpebble 1 sold the property to appellant Sandpebble Apartments, LLC (Sandpebble 2), purportedly assigning its interest in the insurance policy as well. A dispute subsequently arose between Sandpebble 2 and Nevada Capital over the payments Nevada Capital issued under the policy. Sandpebble 2 ultimately sued Nevada Capital, asserting causes of action for breach of contract and declaratory relief. Sandpebble 2 alleged Nevada Capital failed to pay the full amount Sandpebble 2 was owed under the insurance policy.

Nevada Capital moved for summary judgment on the grounds that Sandpebble 2 was not a named insured under the policy and neither the named insured, non-party Sandpebble 1, nor Sandpebble 2 incurred repair costs in excess of payments Nevada Capital made. The trial court overruled Sandpebble 2's objections to Nevada Capital's separate statement and entered summary judgment for Nevada Capital.

Sandpebble 2 contends the judgment must be reversed. It argues that the trial court erred in overruling its objections to Nevada Capital's separate statement; Nevada Capital failed to carry its burden of showing summary judgment was warranted; and Sandpebble 2 demonstrated triable issues of material fact regarding its status as an assignee or third party beneficiary of Sandpebble 1's insurance policy, the accuracy of Nevada Capital's payment calculations, and the propriety of Nevada Capital's withholding of a depreciation payment. Sandpebble 2 also seeks to amend its operative complaint. We affirm the judgment.

2

# FACTUAL BACKGROUND

## I.  *Insurance Policy*

Sandpebble 1 owned real property in Las Vegas, Nevada. It insured the property between April 28, 2015 and April 28, 2016 with an insurance policy issued by Nevada Capital. The policy identified Sandpebble 1 as the named insured, and Canon Financial Services Inc. and Wells Fargo Bank as additional insureds. Neither Sandpebble 2 nor its principal, manager, and sole member, Dmitry Piterman, was mentioned anywhere in the policy.

In the event the insured property sustained covered damage, the policy gave Nevada Capital the option of paying the value of lost or damaged property; paying the cost of repairing or replacing lost or damaged property; taking all or part of the property at an agreed or appraised value; or repairing, rebuilding, or replacing the property with other property of like kind and quality. The policy also provided that Nevada Capital would determine the value of the covered property "[a]t replacement cost without deduction for depreciation," subject to various conditions.

The policy also provided, "Your rights and duties under this policy may not be transferred without our written consent, except in the case of the death of an individual Named Insured." The policy defined "your" to refer to "the Named Insured shown in the Declarations," Sandpebble 1. It defined "our" as "the Company providing this insurance," Nevada Capital.

## II.    *Fire Loss*

On or about June 28, 2015, the property was damaged in a fire. Sandpebble 1 tendered a claim to Nevada Capital on or about the same day.[1]

## III.    *Limited Assignment of Rights and Claims*

Around the time of the fire, Sandpebble 1 was in the process of selling the property. In support of its summary judgment opposition, Sandpebble 2 filed a "Limited Assignment of Rights and Claims" purportedly between Sandpebble 1, Nevada Capital, and Piterman.  According to that document, "the sale was not complete, title had not passed, and escrow had not closed prior to the Fire Loss."  In the Limited Assignment of Rights and Claims, Sandpebble 1, Nevada Capital, and Piterman recognized the need to "facilitate the continued adjustment and the balance of the Fire Claims that would be potentially recoverable by the Insureds [Sandpebble 1] under the terms and provisions of the Policy had there been no sale of the Property."

Citing the provision of the policy that required Nevada Capital to consent in writing to the transfer of Sandpebble 1's "rights and duties under [the] policy," the Limited Assignment of Rights and Claims purportedly assigned to Piterman Sandpebble 1's "rights to make claim [*sic*] and receive payment for [Sandpebble 1's] Fire Claims over the amount [Nevada Capital] has already paid that would have been recoverable and collectible by [Sandpebble 1] under the Policy terms had no sale of the

---

[1]    Although the operative complaint alleges the fire loss claim was submitted "[o]n or about August 2014,"  it is undisputed that the fire and claim submission occurred during the effective term of the policy, in or about June 2015.

Property taken place. . . .".[2] The parties—Sandpebble 1, Nevada Capital, and Piterman—further agreed that Sandpebble 1 and Piterman "are responsible for paying vendors that perform actual repairs, demolition, or restoration work upon the Property." They also agreed that "[t]his limited assignment does not confer any status or standing as an insured or beneficiary under the Policy to [Piterman] or to any other person or entity, or any right or standing to sue [Nevada Capital], whether under theories of contract, equity or tort, save and except the right to sue for performance of the terms of this Agreement."

Sandpebble 2 was neither a party to nor mentioned in the Limited Assignment of Rights and Claims. The signature lines for representatives of Sandpebble 1 and Nevada Capital indicated that those individuals would be signing on behalf of their respective corporate entities. Piterman's signature line did not mention Sandpebble 2 or indicate that he was signing on the entity's behalf. Piterman and a representative of Sandpebble 1 signed the Limited Assignment of Rights and Claims on September 3, 2015. There is no signature by a representative of Nevada Capital.

## IV. *Sale to Sandpebble 2*

Sandpebble 1 sold the property to Sandpebble 2 on September 28, 2015. Sandpebble 2 alleged in the operative complaint that "[p]ursuant to the purchase agreement, Sandpebble 1 assigned all its right [*sic*], title and interest in and to the benefits of the policy and the claims loss to Sandpebble 2." Piterman declared the same in his declaration in support of summary judgment. The purchase agreement was not provided

---

[2]    The parties agreed that Nevada Capital had paid "a total sum of $0.00" at this point.

to the trial court at summary judgment and is not in the appellate record.

## V.   *Initial Repair Work and Payments*

In December 2015, Belfor Property Restoration (Belfor) issued an estimate to repair the property at a cost of $1,298,025.88.[3]  Piterman signed the estimate and agreed to unspecified terms contained therein.  Belfor subsequently commenced repair work on the property.

The cost of the repair work and the amount Nevada Capital paid for it are disputed.  These disputes are not material in light of our ultimate conclusion that Sandpebble 1 did not assign the insurance policy rights and benefits to Sandpebble 2. We note, however, that the parties agreed that Nevada Capital issued some payments to Piterman; Nevada Capital withheld $245,803.11 for "depreciation"; and Belfor ultimately stopped work, placed a lien on the property, and filed a lis pendens in 2017.

## VI.   *Sale of Property, Final Repair Work, and Payments*

It is undisputed that Sandpebble 2 sold the property to non-party Wilshire Unlimited, LLC on or about May 18, 2018. Wilshire Unlimited contemporaneously assigned its interest in the property to non-parties Sandpebble Nevada LLC, CP Sandpebble, LLC, and WU Nevada, LLC as tenants in common; the parties refer to the latter entities collectively as the "Wu Group."

---

[3]     Sandpebble 2 asserted in its dispute facts, without evidentiary support, that the estimate covered "building repair, excluding demolition, asbestos removal, construction fencing, and landscaping."

6

The purchase and sale agreement, filed by Sandpebble 2 with its summary judgment opposition, recognized that some rental units on the property remained "down" due to the fire. Sandpebble 2 represented and warranted that the total cost to complete repairs of the down units was approximately $700,000. It further agreed that if the costs exceeded that amount, "Buyer shall be credited against the Purchase Price an amount equal to the difference between the . . . costs determined by Buyer to be necessary to complete the Down Units and the Estimated Cost to Complete. . . . In review of the current quote from Belfor, Seller agrees to provide a credit of $155,013.10 at Closing."[4]

The purchase and sale agreement also contained a provision regarding insurance proceeds. Sandpebble 2 represented and warranted "that insurance proceeds of at least Three Hundred Thousand Dollars ($300,000.00) will be available to Buyer in order to complete the Down Units." Sandpebble 2 agreed to either assign those proceeds, or, if "written evidence of the assignability of the insurance proceeds to Buyer from the insurance company is not provided . . ., then upon the Closing, Buyer shall receive a credit toward the Purchase[ ] Price equal to Three Hundred Thousand ($300,000.00) (or the difference between the Available Funds and the proof of funds delivered by the insurance company that are available)." Sandpebble 2 and

---

[4] The quote from Belfor was contained in a May 18, 2018 services agreement between Belfor and the Wu Group. The agreement provided that Belfor would be paid $845,013.10 for the remaining work. It is unclear why there is a $10,000 discrepancy between the $155,013.10 credit provided in the purchase and sale agreement and the $145,013.10 difference between the Belfor contract amount and the $700,000 estimate contained in the purchase and sale agreement.

the Wu Group contemporaneously signed a "cooperation agreement" pursuant to which they agreed no insurance proceeds would be assigned. Instead, Sandpebble 2 would provide a $300,000 credit.

At the time of the sale to Wilshire Unlimited/Wu Group, Sandpebble 2 and Belfor entered an agreement pursuant to which Belfor agreed to release the lis pendens and remove the lien in exchange for payment of $430,000. The $430,000 payment to Belfor was made out of escrow when the sale of the property closed. Belfor released the lis pendens and removed the lien a few days later.

After the May 18, 2018 sale, Wu Group and its agents and assignees issued checks to Belfor totaling $814,039.78.[5] The last of these checks was dated March 21, 2019.

In January 2019, counsel for Sandpebble 2 emailed Nevada Capital and requested additional payment in an unspecified amount under threat of legal action. He attached Belfor's invoices from 2018, as well as evidence of payment, including the credits and payments made when the property was sold to Wilshire Unlimited/Wu Group. Nevada Capital refused.

PROCEDURAL HISTORY

I. *Operative Complaint*

Sandpebble 2 filed its initial complaint against Nevada Capital and insurance agent B&B Premier Insurance Solutions (B&B Premier) on August 19, 2019. Sandpebble 2 asserted causes of action for breach of contract, breach of the covenant of

---

[5] Sandpebble 2 asserts the checks totaled $889,306.01, but this total includes one of the checks twice: a $75,276.23 check dated November 27, 2018 and numbered 001292. It also contains a $10.00 discrepancy.

8

good faith and fair dealing, and declaratory relief against Nevada Capital, and a cause of action for negligence against B&B Premier. After a series of demurrers was sustained with leave to amend, Sandpebble 2 ultimately dismissed its negligence cause of action against B&B Premier and filed a third amended complaint against Nevada Capital only, on February 5, 2021.

The third amended complaint asserted only two causes of action: breach of contract and declaratory relief. Sandpebble 2 alleged that Sandpebble 1 submitted a fire loss claim to its insurer, Nevada Capital, in or about August 2014. It alleged that it bought the property from Sandpebble 1 on or about September 28, 2015, and the purchase agreement "assigned all [Sandpebble 1's] right, title and interest in and to the benefits of the policy and the claims loss to Sandpebble 2." It further alleged that "[a]t all times material hereto, Sandpebble 2 was and is the assignee and beneficiary of the entire insurance policy and all claims rights [*sic*] that are the basis of this action." Sandpebble 2 alleged that Nevada Capital authorized Belfor to repair the property, but Belfor "stopped work for lack of payment, and Nevada Capital withheld further disbursements to Belfor. At that time, approximately $450,000 was still owed to Belfor." It alleged that it then sold the property on or about May 18, 2018, providing a credit to Belfor for the outstanding amounts in the purchase and sale agreement. It alleged that Nevada Capital represented that it would pay Sandpebble 2 when the construction was completed, but refused to do so, even after Sandpebble 2 provided requested documentation.

Sandpebble 2 alleged that Nevada Capital's refusal to pay "for the final amounts paid to Belfor" was a breach of the

9

insurance policy. It asserted that the breach caused it damages "in the amount of at least $388,999.27, calculated as follows:

"a.     The original contract with Belfor was in the amount of $1,298,000;

"b.     $117,000 was charged by Belfor in addition to the original contract amount for demolition and pre-contract charges, which was paid directly to Belfor;

"c.     Belfor issued a change order for code upgrades in the amount of $225,334.65;

"d.     Belfor later discounted the code upgrade change order by $99,335.38;

"e.     To date, based upon the documents provided by Belfor and Nevada Capital, Nevada Capital has paid Plaintiff $1,035,000 toward the building repairs, not including payments made for loss of rent."

In its second cause of action for declaratory relief, Sandpebble 2 requested a "judicial determination that Nevada Capital is obligated under the express and implied terms of the Policies [*sic*] to reimburse Plaintiff with respect to the remaining cost of the fire loss."

## II.   *Summary Judgment Proceedings*

### A.     *Motion*

On March 24, 2021, Nevada Capital filed a motion for summary judgment, or, in the alternative, summary adjudication. Nevada Capital argued that the undisputed material facts established that it did not owe additional policy benefits because it paid more on the underlying insurance claim than either its insured, Sandpebble 1, or Sandpebble 2 paid to repair the property. Nevada Capital further argued that it had no obligation to Sandpebble 2 because, even if Sandpebble 2 had

10

been assigned the policy benefits, that was insufficient to make it an insured under the policy.  Nevada Capital contended that the declaratory relief claim was entirely derivative of the breach of contract claim, and it was entitled to summary judgment for the same reasons.  Nevada Capital filed a separate statement and numerous exhibits in support of its motion.

### B.   *Opposition and Objections*

Sandpebble 2 filed a brief opposing the summary judgment motion, supporting exhibits, and a separate statement responding to the facts set forth in Nevada Capital's separate statement.  In its opposition brief, Sandpebble 2 argued that Nevada Capital's admission that it retained $245,803.11 in depreciation alone precluded summary judgment.  Sandpebble 2 further argued that its evidence showed "the repair cost to Sandpebble was $1,439,405.28, plus amounts for asbestos removal, construction fencing, demolition and code upgrade change order," but Nevada Capital only paid approximately $1,035,000 toward the repairs.

Sandpebble 2 also contended summary judgment was unwarranted because "Nevada Capital's mathematical calculations of the numbers and/or its grasp of the facts are just plain wrong."  According to Sandpebble 2, the "true and accurate facts" showed that Sandpebble 2 and Wu Group collectively paid Belfor "$1,439,405.28, plus [unspecified] amounts for asbestos removal, construction fencing, demolition and code upgrade change orders that was [*sic*] outside the $1,298,025.88 and $845,013.18 contracts.  Nevada Capital has only paid [Sandpebble 2] $1,035,000 toward the building repair under the contract with Belfor.  Plaintiff and the Wu [G]roup entered into a cooperation agreement regarding completion of the repairs.

11

Plaintiff paid for the repairs through escrow. . . ."  Sandpebble 2 reiterated its separately made objections to Nevada Capital's separate statement, and accused Nevada Capital of misleading the court through "attempts to pin Plaintiff down by citing Plaintiff's responses to Nevada Capital's interrogatories."  It contended that it "later discovered [unspecified] proof and facts in discovery from Nevada Capital and by subpoena from third parties that were obtained after Plaintiff [sic] interrogatory responses."

Sandpebble 2 separately objected to Nevada Capital's separate statement as "contain[ing] improper argument and misleading statements."  Though it objected to "undisputed facts numbered 6-11, 13, 16-22, 25, 28, 32-38," it included only the following explanation of its grounds, omitting some listed paragraphs while adding others: "6 ('substantial payments'); 7 (combining all loss payments together and not addressing building repair costs); 11 (completely misleading); 15 [sic] (argument); 17 (argument); 19 (argument); 24 [sic] (argument and misleading); 28 (argument); 34 (misleading); 35 (argumentative and misleading); and 36 (argumentative and misleading)."  The objections refer to "Objections to Evidence filed herewith," but no such document appears in the trial court docket or the appellate record.

### C.  *Reply and Objections*

In its reply, Nevada Capital argued that any expenditures by the Wu Group were irrelevant, because the "policy does not afford any benefits based on the amounts that the Wu Group paid."  It further argued that the alleged assignment of benefits under the policy did not make Sandpebble 2 an insured under the policy—but, even if it had, "Nevada Capital paid more towards

12

the repairs than Sandpebble 1 and Plaintiff, combined, ever paid, even after considering the credits that Plaintiff provided to the Wu Group." Nevada Capital disputed that it breached the policy by withholding the depreciation, because the insured, Sandpebble 1, did not pay more to repair the property than Nevada Capital disbursed. Nevada Capital also filed evidentiary objections to numerous statements made in the declarations Sandpebble 2 submitted in opposition to the summary judgment motion.

### D.   *Hearing and Ruling*

The court heard the motion on June 10, 2021 and took the matter under submission. The appellate record does not contain a reporter's transcript of the hearing.

The court issued a written ruling on July 1, 2021. The court first addressed the parties' objections. It overruled Sandpebble 2's objections to Nevada Capital's separate statement as "improper," because "the summary of evidence set forth in the Separate Statement is not evidence subject to objection," and Sandpebble 2 did "not object to the cited evidence supporting these facts to which Plaintiff has raised objections." The court sustained eight of Nevada Capital's objections and overruled 10 others. Because neither party challenges the rulings on Nevada Capital's objections, facts with sustained objections were omitted from the recitation above.

The court then considered the breach of contract claim. It determined that Sandpebble 2 would have to establish three elements to prevail: "(1) that plaintiff suffered a loss, all or part of which was covered under an insurance policy with defendant; (2) that defendant was notified of the loss as required by the policy; and (3) the amount of the covered loss that defendant failed to pay." The court concluded that Nevada Capital met its

13

initial burden of showing that Sandpebble 2 could not establish the first of these elements. Specifically, "Defendant submitted evidence the Policy provides that the rights and duties of the Named Insured shown in the Declarations, Sandpebble 1, may not be transferred without Defendant's written consent . . . . Defendant submitted evidence it never consented to an assignment of the Sandpebble 1 Policy to Plaintiff. Defendant's evidence establishes that Sandpebble 1, not Plaintiff is the insured party under the Policy. As such, given Defendant is required to pay the cost to repair in an amount not more than the policyholder actually spent to repair the Property, any amounts purportedly paid by Plaintiff or the subsequent purchaser the Wu Group were not made by the policyholder. To the extent the claim is based on amounts paid by Plaintiff (or the Wu Group), any rights Sandpebble 1 had to seek such payments pursuant to the Policy were not assignable to Plaintiff or the Wu Group absent Defendant's written consent, which was not provided." The court accordingly concluded that the burden shifted to Sandpebble 2 to demonstrate a triable issue of material fact.

The court concluded Sandpebble 2 failed to meet its burden. The court found Sandpebble 2 did not submit evidence supporting its allegations that it was an assignee or beneficiary of the policy, or refuting Nevada Capital's evidence that Sandpebble 1 was the named insured and Nevada Capital did not provide the written consent required for Sandpebble 1 to assign the policy. The court further concluded that the Limited Assignment of Rights and Claims did not create a triable issue of material fact, "because, by its terms, it is between Sandpebble 1 as 'Insureds' and non-party [Dmitry] Piterman ('Piterman') as 'Buyers' along with Defendant as the insurance company, and Plaintiff is not a party to the

14

Assignment." The court added that the Limited Assignment of Rights and Claims was not signed by Nevada Capital, "and as such, there is no triable issue of fact as to Defendant's evidence it did not sign or consent to any assignment of Sandpebble 1's rights and duties under the Policy."

In light of the above, the court declined to reach Nevada Capital's arguments "relating to: (1) whether Plaintiff can present evidence the costs incurred to repair the Property exceeded the amount paid by Defendant for the purposes of establishing a breach; and/or (2) whether Plaintiff can establish that Sandpebble 1, the party insured by the Policy, incurred any costs to repair the damage."

The court then considered the declaratory relief cause of action. It concluded that Sandpebble 2's failure to address the cause of action in its opposition operated as a concession to Nevada Capital's argument that it was derivative of the breach of contract cause of action. The court thus concluded that summary adjudication was warranted on this cause of action for the same reasons as the breach of contract action.

The court entered judgment for Nevada Capital on July 26, 2021. Sandpebble 2 timely appealed.

## DISCUSSION

Sandpebble 2 contends the trial court erred by granting summary judgment in favor of Nevada Capital. It argues that the trial court improperly overruled its objections to Nevada Capital's separate statement, and Nevada Capital did not meet its initial burden. Even if Nevada Capital successfully made its prima facie showing, Sandpebble 2 argues that it demonstrated "numerous triable issues of material fact," including whether Nevada Capital's calculations were accurate, whether

15

Sandpebble 2 was an assignee of the policy or an intended beneficiary of the assignment to Piterman, and whether Nevada Capital improperly retained and was unjustly enriched by the depreciation.  Sandpebble 2 also requests an opportunity to amend the operative complaint to name Piterman as a real party in interest if we conclude Piterman was entitled to receive the benefits of the insurance policy.

We conclude the trial court properly overruled Sandpebble 2's improper objections, correctly concluded that Nevada Capital met its burden of showing Sandpebble 2 could not establish one or more elements of its causes of action, and correctly concluded that Sandpebble 2 failed to demonstrate a material issue of triable fact.

## I.  *Standard of Review*

We review the trial court's summary judgment ruling de novo.  (See *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)  "'In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing [the defendant's] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor.'"  (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 100.)

A defendant moving for summary judgment must make a prima facie showing that there are no triable issues of material fact in order to meet its initial burden of production.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861; see also Code Civ. Proc. § 437c, subd. (c).)  Once the defendant has met that burden, the burden shifts to the plaintiff to make a prima facie showing that a triable issue of material fact exists.  (*Aguilar*

*v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 850.) "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

## II.    *Rulings on Objections*

Sandpebble 2 argues that Nevada Capital's separate statement was procedurally defective, and the trial court thus abused its discretion in overruling Sandpebble's objections thereto. We agree with Sandpebble 2 and the weight of authority that abuse of discretion is the proper standard of review for this issue. (See *Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶ 8.168, p. 8-148 ["Pursuant to the weight of authority, appellate courts review a trial court's rulings on evidentiary objections in summary judgment proceedings for abuse of discretion."].) We find no abuse of discretion here.

Sandpebble 2 cited no legal authority for its objections in the trial court, nor did it clarify what its objections to several paragraphs even were. These deficiencies alone provided the trial court a valid basis to overrule the objections. (See Evid. Code, § 353.) They also remain largely unremedied on appeal. Although Sandpebble 2 cites Code of Civil Procedure section 437c, subdivision (b)(1) for the proposition that a separate statement must contain facts, and California Rules of Court, rule 3.1350(d)(2) for the proposition that a separate statement should only include material facts, it does not explain how, or even what portions of, the challenged paragraphs of the separate statement violated those requirements.

17

More fundamentally, as the trial court observed, Sandpebble 2 objected only to assertions made in Nevada Capital's separate statement, not the evidence those assertions cited. Assertions made in a separate statement are not evidence. "'Objections' to such statements are therefore ineffectual." (*Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 767 fn. 8 [referring to statements made in a memorandum of points and authorities].) The trial court did not abuse its discretion in overruling Sandpebble 2's objections.

## III. *Satisfaction of Initial Burden*

Sandpebble 2 contends Nevada Capital did not meet its initial burden because its "calculations were inaccurate, incomplete and mathematically incorrect. Most importantly, [*sic*] failed to establish why they paid out a portion of the policy benefits but refused to pay out $245,803.11 of remaining policy benefits that they admitted they intentionally retained." Sandpebble 2 does not clarify which cause of action it is discussing, or what the elements of the relevant causes of action are.

A defendant moving for summary judgment has the initial burden to show the plaintiff cannot establish one or more elements of the challenged cause of action or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) A defendant meets its burden by presenting affirmative evidence negating an essential element of the plaintiff's claim, or demonstrating that "the plaintiff does not possess, and cannot reasonably obtain, needed evidence" to prove an essential element. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 855.)

## A. *Breach of Contract*

Sandpebble 2's first cause of action was for breach of contract. "To state a cause of action for breach of contract, a party must plead the existence of a contract, his or her performance of the contract or excuse for nonperformance, the defendant's breach, and resulting damage." (*Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 307.) "Wrongful failure to provide coverage or defend a claim is a breach of contract." (*Isaacson v. California Insurance Guarantee Association* (1988) 44 Cal.3d 775, 791.) In the context of a claim alleging breach of an insurer's contractual duty to pay a covered claim, the plaintiff must prove that it suffered a loss covered by the policy, that it notified the insurer of the loss in the manner required by the policy, and the amount of the covered loss the insurer failed to pay. (See CACI 2300.)

Here, Nevada Capital submitted evidence showing that Sandpebble 1 was the named insured under the insurance policy at issue, and that Sandpebble 2 was not. Nevada Capital also submitted evidence that the policy contained a provision stating that the named insured could not transfer its rights and duties under the policy without the written consent of Nevada Capital, and that no such consent was provided to assign the rights and duties to Sandpebble 2 or Wu Group. This evidence was sufficient to show that Sandpebble 2 could not establish that there was a contract between Nevada Capital and Sandpebble 2, or that Sandpebble 2 suffered a loss that was covered by the policy. The accuracy of mathematical calculations or retention of benefits is not relevant to the threshold issue whether Sandpebble 2 was covered by the policy in the first instance.

19

Sandpebble 2's argument that Nevada Capital failed to carry its initial burden on the breach of contract claim thus lacks merit.

## B.    *Declaratory Relief*

"[T]o state a cause of action for declaratory relief, there must be an 'actual controversy' relating to the legal rights and duties of the parties." (*Country Side Villas Homeowners Assn. v. Ivie* (2011) 193 Cal.App.4th 1110, 1118; see also Code Civ. Proc., § 1060 ["Any person interested under a written instrument . . . or under a contract, or who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract."].)   Notwithstanding the existence of an actual controversy, a claim for declaratory relief that is "wholly derivative" of a failed claim cannot stand.   (See *Ball v. FleetBoston Financial Group* (2008) 164 Cal.App.4th 794, 800.)

The declaratory relief Sandpebble 2 requested in the operative complaint was "a judicial determination that Nevada Capital is obligated under the express and implied terms of the Policies [*sic*] to reimburse Plaintiff with respect to the remaining cost of the fire loss."   This is in essence a restatement of the cause of action for breach of contract: Sandpebble 2 requested a declaration that Nevada Capital breached the policy. It is therefore "wholly derivative" of the breach of contract cause of action, and Nevada Capital met its initial burden by meeting its burden on the breach of contract cause of action.

20

## IV.    *Failure to Meet Shifted Burden*

Once the defendant has met its initial burden, the burden shifts to the plaintiff to make a prima facie showing that a triable issue of material fact exists. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.) Sandpebble 2 contends it met that burden—presumably as to both intertwined claims—by producing evidence showing that Nevada Capital paid funds to and on behalf of Piterman. It argues, "If there was no assignment of policy benefits, they [*sic*] why would [Nevada Capital] be paying out benefits to Dmitry Piterman and Sandpebble 2's lender? The answer is: there *had* to have been an assignment – otherwise [Nevada Capital] would not have been paying out benefits to Dmitry Piterman and Sandpebble 2 and its lender. The trial court committed error in finding there was no enforceable assignment to either Dmitry Piterman or Sandpebble 2."

Construed in the light most favorable to Sandpebble 2, the evidence shows that Nevada Capital made payments to Sandpebble 2's principal, Piterman, notwithstanding Nevada Capital's failure to sign the Limited Assignment of Rights and Claims. It is reasonable to infer from this evidence that Nevada Capital consented to an assignment of rights to Piterman. It is not reasonable, however, to make the secondary inferential leap that Nevada Capital consented to an assignment of rights to Sandpebble 2. The Limited Assignment of Rights and Claims does not mention Sandpebble 2 or indicate that Piterman was signing the agreement on the entity's behalf. To the contrary, the Limited Assignment of Rights and Claims specifically states that it "does not confer any status or standing as an insured or beneficiary under the Policy to [Piterman] or to any other person

21

or entity." The check ledger submitted by Sandpebble 2 does not identify Sandpebble 2 as a payee on any of the 35 checks Nevada Capital issued in connection with the claim.[6] Even the Belfor estimate signed by Piterman does not mention Sandpebble 2. This evidence accordingly does not establish that Sandpebble 2, a legal entity separate and distinct from Piterman, received any benefits under the policy or was treated as an assignee by Nevada Capital.

Sandpebble 2 additionally points to Piterman's declaration, in which he asserted that "Sandpebble 1 assigned all its right, title and interest in and to the benefits of the policy and the claims loss to Sandpebble 2" pursuant to the purchase agreement. The purchase agreement is not in the record, and there is no suggestion in the declaration or elsewhere that Nevada Capital was party to the agreement or consented to the assignments it purportedly contained as required by the policy. This conclusory statement accordingly does not raise a triable issue of material fact regarding assignment of the policy.

Nor does it or the other evidence warrant granting Sandpebble 2's belated request to amend the operative complaint to add Piterman as the real party in interest. "If the motion for summary judgment presents evidence sufficient to disprove the plaintiff's claims, as opposed to merely attacking the sufficiency of the complaint, the plaintiff forfeits an opportunity to amend to state new claims by failing to request it." (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1663.) "[A] plaintiff

---

[6]     It also shows that all checks that were made jointly payable to Sandpebble 1 and its lenders, or to the entity Sandpebble 2 asserts without evidentiary support was Sandpebble 2's lender, were either voided or had payment stopped.

wishing 'to rely upon unpleaded theories to defeat summary judgment' must move to amend the complaint before the hearing." (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648.) No such request was made in the trial court, despite the numerous opportunities Sandpebble 2 was given to amend its complaint. We decline leave to amend at this juncture.

Sandpebble 2 asserts for the first time on appeal that Nevada Capital "is estopped from denying their consent to the assignment since Appellant incurred the expense of the ongoing repairs in reliance upon [Nevada Capital's] previous performance and payment of repairs." This argument cannot be raised for the first time on appeal. Nor can Sandpebble 2's alternative contention that it is an intended beneficiary of any assignment to Piterman. Even if the latter argument were properly raised, Sandpebble 2 has not pointed to any evidence that "the contracting parties must have intended to benefit [Sandpebble 2] and such intent appears on the terms of the agreement." (*Harper v. Wausau Ins. Co.* (1997) 56 Cal.App.4th 1079, 1087.) To the contrary, the Limited Assignment of Rights and Claims specifically states that it "does not confer any status or standing as an insured or beneficiary under the Policy to [Piterman] or to any other person or entity."

Sandpebble 2 has not raised a triable issue of material fact regarding the assignment of the insurance policy rights and benefits to Sandpebble 2. It accordingly has not demonstrated that the trial court erred in granting summary judgment for Nevada Capital on that basis. We need not and do not address its arguments regarding the accuracy of Nevada Capital's

calculations or its retention of the depreciation and alleged unjust enrichment thereby.

## DISPOSITION

The judgment of the trial court is affirmed. Nevada Capital is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.